1

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

3

SERVIDORES PUBLICOS UNIDOS, COUNCIL
95 OF THE AMERICAN FEDERATION OF
STATE, COUNTY AND MUNICIPAL
EMPLOYEES; SANDRA PACHECO
SANTIAGO; CARLOS REYES CASTRO; and
MIGUEL ANGEL ORTIZ RAMOS,

Plaintiffs,

v.

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO;
MEMBERS OF THE FINANCIAL OVERSIGHT
AND MANAGEMENT BOARD FOR PUERTO
RICO, including Jose B. Carrion III, Andrew G.
Biggs, Carlos M. Garcia, Arthur J. Gonzalez, Jose
R. Gonzalez, Ana J. Matosantos, David A. Skeel,
and Elias Sanchez, in their official capacity as the
appointed members and ex oficio member of the
Financial Oversight and Management Board for
Puerto Rico; the COMMONWEALTH OF
PUERTO RICO; and RICARDO ANTONIO
ROSSELLO NEVARES, in his official capacity as
the Governor of the Commonwealth of Puerto Rico

Defendants.

Civil Case No.

**COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF**
**(28 U.S.C. §§ 2201 & 2202; 29 U.S.C. § 1983)**

Plaintiffs SERVIDORES PUBLICOS UNIDOS, COUNCIL 95 OF THE AMERICAN

FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES ("SPU"); SANDRA

PACHECO SANTIAGO; CARLOS REYES CASTRO; and MIGUEL ANGEL ORTIZ RAMOS,

("Plaintiffs") hereby allege as follows:

## I.      INTRODUCTION

1.      This action is brought to protect Plaintiffs' fundamental rights as established in three

foundational documents designed to restrain the exercise of unbridled authority over the Puerto Rican

people—the United States Constitution, the Puerto Rico Commonwealth Constitution, and the Puerto

Rico Oversight, Management, and Economic Stability Act ("PROMESA" or "the Act"), Public Law

114-187, 48 USC § 2101, *et seq.*  The relief sought herein is further authorized by the Civil Rights

Act of 1871, 42 U.S.C. § 1983.

2.      Plaintiffs SPU, an employee organization (or labor union) as that term is defined under Puerto Rico Commonwealth law, and certain named individual SPU members, including both active and retired employees of the Commonwealth (together, "Plaintiffs"), bring this action against the Commonwealth of Puerto Rico ("Commonwealth"), Governor RICARDO ANTONIO ROSSELLO NEVARES of Puerto Rico acting in his official capacity ("Governor"), and the FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO and its members acting in their official capacity ("Oversight Board").

3.      Plaintiffs complain that the purported approval and certification of a Fiscal Plan, as defined by PROMESA, for Puerto Rico on March 13, 2017 (the "Final Fiscal Plan") not only violated PROMESA itself, both procedurally and substantively, but also requires the Commonwealth to unconstitutionally (a) impair contractual rights to vested and already-accrued pension benefits that were earned by completed performance of employment services for the Commonwealth, and (b) take employees' individual retirement savings accounts funded solely and directly by the employees' own wage deductions and fixed investment gains thereon.

4.      By requiring the Commonwealth to reduce retirees' and employees' earned and vested retirement income security, the Final Fiscal Plan contravenes the clearly-stated requirement that any Fiscal Plan adopted under PROMESA must "provide adequate funding for public pension systems" per section 201(b)(1)(C) of PROMESA, an obligation also imposed by the Commonwealth and U.S. Constitutions.

5.      When providing for the creation of the Oversight Board to manage the financial affairs of Puerto Rico, Congress crafted PROMESA to strike a careful balance between the popular will of the Puerto Rican people as expressed through their democratically-elected representatives, and the territorial powers of Congress.  In doing so, Congress granted significant authority to the Oversight Board while constraining that authority both in terms of the procedure by which Fiscal Plans are developed and by placing constraints on the substance of such Fiscal Plans. This balance was intended to protect stakeholders but primarily the people of Puerto Rico, who are entitled to a functioning government that can provide essential services and safety, and which includes thousands

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

of citizens who are the employees of the government tasked with this challenging and urgent obligation.

6.    Perhaps the clearest manifestation of this careful congressional balancing is the process for settling on the Fiscal Plan which, once certified, serves as a financial roadmap for the Commonwealth as it steers itself towards financial recovery.  For this reason, PROMESA provides the Oversight Board with two, *and only two*, paths to attaining a Fiscal Plan: the Oversight Board must either (a) exercise "its sole discretion" to approve as-is a Fiscal Plan developed by the democratically-elected Governor, or (b) develop its own Fiscal Plan, but subject to *de novo* review of whether the Fiscal Plan complies with the requirements of Section 201(b) of PROMESA.

7.    Unfortunately, the Oversight Board did neither, but instead charted an unauthorized, dangerous and uncertain path for the Commonwealth by departing from PROMESA's procedural and substantive requirements.  The Oversight Board opted to declare it had "approved" the democratically-elected Governor's Fiscal Plan in an "amended" form, even though PROMESA provides no authority to the Oversight Board to do so.  The amendments imposed on the Governor's Fiscal Plan provide for additional, and steep, cuts to public employee wages and benefits, and additional cuts to constitutionally-protected vested retirement benefits.

8.    It must be noted that the Governor is accountable to the People of Puerto Rico as decreed by their Commonwealth Constitution, whereas the Oversight Board is not.  For this reason, PROMESA sets forth different procedures with respect to review of Fiscal Plans devised by the Governor and those devised by the Oversight Board, permitting greater scrutiny over Fiscal Plans devised by the Oversight Board.  Upon information and belief, this was the motivation for the Oversight Board's departure from PROMESA's procedures when it declared that it was approving and certifying the Governor's proposed Fiscal Plan pursuant to PROMESA Section 201(e), but subject to its own amendments while simultaneously neglecting to specify, as required by PROMESA, whether the approval and certification occurred pursuant to Section 201(e)(1) (entitled "Approval of Fiscal Plan Developed by the Governor") or Section 201(e)(2) (entitled "Deemed Approval of Fiscal Plan Developed by Oversight Board").

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

9.      The unconstitutional impairment and taking of retirement benefits alleged herein, and its effectuation by the PROMESA-violating Final Fiscal Plan, was occasioned by the acts of Defendant Governor, the members of the Oversight Board, and their agents or subordinates acting under official authority.

10.     Plaintiffs are, or represent, active and retired public servants of Puerto Rico.  Plaintiffs are invested in the Commonwealth's financial recovery and desire, above all else, for it to thrive (and certainly more than many of those to whom the Commonwealth allegedly owes other financial debts).

11.     It must be stated clearly that the relief sought by Plaintiffs is narrow and modest. Plaintiffs seek only a declaration that the Final Fiscal Plan is unlawful and, as explained below, seek to enjoin its implementation including its use as a basis for the Commonwealth's annual budget and as a means to invoke Title III of PROMESA, which authorizes bankruptcy protection for the Commonwealth under the terms of a Fiscal Plan.  Plaintiffs do not seek to stall the Commonwealth's economic recovery, and such an order would not prevent or prohibit the Governor or the Oversight Board from certifying *a different* Fiscal Plan.

12.     Indeed, Plaintiffs seek to avoid the harm of protracted litigation and the cloud of uncertainty that would follow any effort to implement the Final Fiscal Plan, including its serving as the precondition to seeking bankruptcy protection under Title III of PROMESA.  As stated below, the Final Fiscal Plan violates Plaintiffs' rights under the U.S. Constitution, Commonwealth Constitution, and PROMESA itself by purporting to reduce accrued retirement benefits that employees of the Commonwealth have earned and funded by dedicating their productive lives to serving the Commonwealth and its people.  Congress recognized this fact when it enacted PROMESA and specifically required any Fiscal Plan to adequately fund the Commonwealth's pension systems, an obligation the Final Fiscal Plan ignores.

13.     The Commonwealth's current and future retirees are not rich and will not become rich because of their pensions.  To the contrary, many of them will suffer grievous harm from the cuts promised by the Final Fiscal Plan, which threatens to plunge them to the Federal Poverty Line, if it is permitted to be implemented, and are already suffering injury grappling with the cuts that the Final Fiscal Plan promises.

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

14.     For these reasons, Plaintiffs are compelled to challenge the illegality of the Final Fiscal Plan now, before Defendants attempt—as they imminently will—to rely on the Final Fiscal Plan as the precondition for a Commonwealth bankruptcy petition and eventual plan of debt adjustment under Title III of PROMESA.  In addition to the harms caused by the Final Fiscal Plan to Plaintiffs now, allowing the Commonwealth to move forward under it will create uncertainty and the likely prospect that its implementation will not be sustained once this case reaches its conclusion. Such an outcome benefits neither Plaintiffs, Defendants nor the Commonwealth and its people.

15.     Accordingly, Plaintiffs seek declaratory and injunctive relief that Defendants' development, approval, and certification of the Final Fiscal Plan constitutes an impairment of contract in violation of Article I, Section 10 of the United States' Constitution ("U.S. Contracts Clause"); a taking without due process or just compensation in violation of Amendment 5 of the United States Constitution ("Fifth Amendment"); an impairment of contract in violation of Article II, Section 7 of the Puerto Rico Constitution ("Puerto Rico Contract Clause"); a deprivation of property without due process in violation of Article II, Section 7 of the Puerto Rico Constitution ("Puerto Rico Due Process Clause"); a taking of property without just compensation in violation of Article II, Section 9 of the Puerto Rico Constitution ("Puerto Rico Takings Clause"); a violation of the requirement, set forth in section 201 of PROMESA at 48 U.S.C. § 2141(b)(1)(C), that an approved Fiscal Plan "provide adequate funding for public pension systems"; and a violation of the Fiscal Plan approval and certification procedures set forth in Section 201 of PROMESA at 48 U.S.C. § 2141(c-e).

16.     Above all, because a Fiscal Plan for Puerto Rico is both a precondition of, and the governing document for, any future bankruptcy filing by the Commonwealth under Title III of PROMESA—a bankruptcy filing which is both imminent and which would automatically stay this Complaint—allowing the illegal Final Fiscal Plan to remain in effect, and thereby effectuate the violation of Plaintiffs' constitutional rights while simultaneously contravening the terms of PROMESA, threatens Plaintiffs with imminent, irreparable and irreversible harm.

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

## II.    JURISDICTION

17.    This United States District Court has original subject matter jurisdiction under 28 U.S.C. § 1331, as this matter arises under the Constitution of the United States, namely the U.S. Contracts Clause and Fifth Amendment, US Const. Art. I, § 10, and Amend. V, respectively.

18.    Jurisdiction is also proper and authorized under PROMESA, specifically 48 U.S.C. § 106, because this action is brought against an Oversight Board established under the Act and arises out of a "Fiscal Plan" as defined by 48 U.S.C. § 2104(10).  Plaintiffs also seek relief pursuant to 42 U.S.C. § 1983, as the Individual Defendants as herein defined, acting under the color of law, have deprived Plaintiffs of rights guaranteed by both the United States Constitution and by PROMESA.

19.    This Court has supplemental subject matter jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' claims arising under the Puerto Rico Constitution, because those claims form part of the same case and controversy and involve identical factual allegations as Plaintiffs' claims arising under the United States Constitution and PROMESA.

20.    The Court is authorized to provide declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and issue injunctive relief pursuant to Fed. R. Civ. Procedure 65.

21.    Venue in this District Court is appropriate because a substantial part of the events giving rise to the claim occurred in Puerto Rico, and because Plaintiffs' unconstitutionally-taken property is situated in Puerto Rico. Further, 48 U.S.C. § 2126 obligates the filing of this suit in the District of Puerto Rico.

## III.    THE PARTIES

22.    Plaintiff SERVIDORES PUBLICOS UNIDOS, COUNCIL 95 OF THE AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES ("SPU") is a membership association and a recognized labor union within the meaning of Puerto Rico law, 3 L.P.R.A. § 1451a(v).  Specifically, it is the recognized exclusive collective bargaining representative of multiple bargaining units of employees employed by the Commonwealth, within the meaning of the Puerto Rico Public Service Labor Relations Act, Act 45 of 1998, as amended, 3 L.P.R.A. § 1451, *et seq.* ("Law 45").  SPU represents over ten thousand employees of the Commonwealth affected by the Final Fiscal plan.  SPU also admits to membership and represents Commonwealth retirees through

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

SPU's retiree chapter, which includes retirees receiving benefits from the Employees Retirement System ("ERS"), including some who were not represented by SPU during their active employment but have joined the Retiree Chapter since. SPU's Retiree Chapter currently represents approximately 2,300 retired employees. SPU's Retiree Chapter members receive a pension from the Commonwealth's pension system in the form of twice-monthly annuity checks, from which SPU Retiree Chapter dues are voluntarily deducted.

23.     Plaintiff SPU sues in its capacity as a membership organization on behalf of, and in its capacity as a representative of, its members, both active and retired, who are affected by the impairment, taking, and statutory violations of which Plaintiffs complain.

24.     Plaintiff Sandra Pacheco Santiago has been an active employee of the Commonwealth Department of Transportation and Public Works, hired as an office clerical assistant. She is a member of SPU and President of SPU Local 3889, which represents her Department's in-office employees. Her gross monthly salary is $1,985—for net monthly take-home pay of $1,178.61 after all deductions—which she uses to support not only herself and her retired husband (both of whom suffer from diabetes, hypertension, and high blood pressure), but also to help provide financial assistance to her four children and seven grandchildren. Until July 1, 2013—the effective date of Act 3 of 1999—she accrued a right to a defined benefit pension under the terms set forth in Act 1 of 1990. Since July 1, 2013, the Commonwealth has deducted a portion of her wages as the sole funding source for her defined contribution individual retirement account administered by ERS.

25.     Plaintiff Miguel Angel Ortiz Ramos worked for the Commonwealth Police Department from 1976 until 2009. He is now retired and a member of SPU's Retiree Chapter. In exchange for his career of service as a police officer, he was promised a defined benefit pension by Act 447 of 1951. He currently receives his promised pension by way of two checks monthly, together totaling gross income of $2,470.84 per month, $274 of which is then automatically deducted to pay for health insurance. This constitutes his entire retirement income—because he spent his career as a police officer, he was not eligible for Social Security—and with it he must support himself and his wife, who has neither regular employment nor receives retirement benefits. His fear of the

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

pension cuts promised by the Oversight Board in the Final Fiscal Plan has led him to look for work, but he has not been able to find employment in the work force.

26.    Plaintiff Carlos Reyes Castro is a veteran of the United States Army who, following his military service to his country and his graduation from the University of Puerto Rico, worked for the Commonwealth Department of Commerce from 1976-1979 and then for the Commonwealth's Tourism Company until 1999, rising to the rank of Comptroller.  At the public Tourism Company, he was chiefly responsible for managing the Company's budgetary appropriations, working closely with the Legislature.  In exchange for his career of public service, he was promised a defined benefit pension by Act 447 of 1951.  He currently receives his promised pension by way of two checks monthly, together totaling gross income of $2,459.06 per month, a significant portion of which is reduced to pay back loans made to him via ERS—a scenario true for many ERS retirees.  In total, of his $29,808.72 in gross annual pension salary, $9,531.36 was automatically deducted by ERS to make his loan payments, yielding an annual take home pension benefit of $20,277.36.  A portion of that benefit is attributable to his military service.  He is married and has 3 children, 4 grandchildren, and 2-step grandchildren.  His wife is fully disabled, suffering from Parkinson's disease, diabetes, high blood pressure, and hypertension, each of which requires costly medical care.  He fears that the pension cut promises made by the Oversight Board in the Final Fiscal Plan will be disastrous for him and his family, especially as his wife's condition continues to worsen.  He cannot return to work to supplement his income due to the support she requires, and, regardless, at age 71 his job prospects are slim in a struggling Commonwealth economy.

27.    Defendant RICARDO ANTONIO ROSSELLO NEVARES is sued in his official capacity as the Governor of the Commonwealth of Puerto Rico ("Governor").  Defendant Governor submitted to the Oversight Board a proposed Fiscal Plan on March 13, 2017, which, both by its own terms but especially as having been purportedly approved and certified as amended by the Oversight Board, impairs Plaintiffs' contractual rights, provides for the taking of their property, and violates PROMESA.  The Governor is charged with implementing the Final Fiscal Plan in his capacity as the executive of the Commonwealth, including providing for the implementation of the Final Fiscal Plan

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

in the Commonwealth's annual budgets.  In doing so, the Governor, and his subordinates, act under color of law.

28.    Defendants the MEMBERS OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO ("Oversight Board") currently include Jose B. Carrion III, Andrew G. Biggs, Carlos M. Garcia, Arthur J. Gonzalez, Jose R. Gonzalez, Ana J. Matosantos, David A. Skeel, and Elias Sanchez, each of whom is sued in his/her official capacity as a member of the Board (together with Defendant Governor, the "Individual Defendants").  The members of the Oversight Board and their subordinates, acting under color of law, purported to develop, approve, and certify the Final Fiscal Plan, which impairs Plaintiffs' contract rights, takes their property, and violates the processes and requirements of PROMESA.  Pursuant to Section 101(c) of PROMESA, 48 U.S.C. § 2121(c), the Oversight Board is a Commonwealth government entity and therefore the Oversight Board members are officers of the Commonwealth.

29.    Defendant THE COMMONWEALTH OF PUERTO RICO ("Commonwealth") is a territory of the United States.  PROMESA section 106 authorizes this action and further requires all actions "arising out of" PROMESA involving Puerto Rico to be brought in this United States District Court.  The Commonwealth is a proper defendant and subject to the jurisdiction of this Court, as this claim arises out actions taken by the Commonwealth ostensibly under PROMESA.

30.    Defendant THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO ("Oversight Board") is an entity within the Commonwealth government as set forth at 48 U.S.C. § 2121(c)(1).

31.    The Individual Defendants are Commonwealth officers acting under color of law—both Commonwealth law and PROMESA, among others.

32.    All Defendants herein are collectively referred to as "Defendants."

## IV.    FACTUAL ALLEGATIONS

### A.    THE RETIREMENT BENEFITS

33.    Under Commonwealth law, pension benefits offered and provided to Commonwealth employees are vested rights protected under the Article II, Section 7 of the Constitution of Puerto Rico ("Commonwealth Contracts Clause").   The basis for the SPU members' and the Individual

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

Plaintiffs' rights are the statutes providing for the pension benefits and the performance of service by Commonwealth employees working under such statutes.

34.     Here, the Individual Plaintiffs' retirement benefits derive from promises made by the Commonwealth by multiple succeeding statutes, beginning in 1951 under Act 447, which established the Employees Retirement System ("ERS") effective January 1, 1952, and since amended.

*The Commonwealth's Defined Benefit Plan – Act 447 and Act 1*

35.     At its inception, Act 447 covered all full-time employees of the Commonwealth Government and its instrumentalities, making membership in the system a mandatory condition of employment.  In addition to specific provisions governing disability and occupational death annuities (Sections 9-12), Act 447 provided, *inter alia,* that as of January 1, 1955, a member of ERS "shall be entitled to receive" an annuity upon retirement based on a multiplier of 1.5%, average salary, and years of service, with certain adjustments; retirement benefits were available upon separation from and completion of 25 years of service and reaching an age of at least 55 years, or 10 years of service with an age of at least 58 years (Section 6-7).  Payment of benefits became mandatory at age 65 for all employees (*Id.*).  ERS was created as a trust (Section 15) in which employees make mandatory contributions that are directly deducted from their earned wages, at the rate of 6% for police and fire fighters and 5.5% for all other members.

36.     Act 447 clearly recognizes the vested contractual right to retirement benefits that employees accrue through their service to the Commonwealth.  For example, Act 447 states the retirement and disability annuities earned "shall be payable in equal monthly installments as life annuities, and shall not be increased, decreased, revoked or repealed" (Section 25) and "shall constitute obligations of the employer" (Section 26).

37.     Further, the Act specifically defines the retirement benefits in contractual terms and as a vested contractual right, providing "that every employee who is a member of the System consents and agrees to the [mandatory wage] deductions . . . and in consideration of such consent and agreement, each member shall obtain a vested interest in the contributions made by him" (Section 20).  Act 447 also requires employer contributions to be "sufficient to provide" the promised benefits (Section 21).  Further recognizing that retirement annuities, once earned, constitute vested rights, Act

10

447 provides that any member not eligible for a retirement annuity "shall be paid . . . a refund equal to the amount of his contributions to the System, including regular interest" and "shall thereby forfeit and waive all *accrued rights* in the System" (Section 14, emphasis added).

38.    Act 447 has been amended several times since 1951, each time preserving the benefits theretofore earned by employees and retirees.  For purposes of this Complaint, three amendments are most pertinent: Act 1 of 1990 ("Act 1"), Act 305 of 1999 ("Act 305" or "Reform 2000"), and Act 3 of 2013 ("Act 3").

39.    The benefits of so-called "Act 447 members"—members hired prior to April 1, 1990, the effective date of Act 1—were, until Act 3 took effect in 2013, accrued as traditional defined benefit pensions ("DB Pensions").  Such a benefit provides for a guaranteed retirement annuity benefit calculated by multiplying the retiree's years of service under the plan by his/her average annual compensation and by a fixed multiplier (and then adjusting to account for certain other factors. e.g., mandatory minimum or maximum pension amounts).  The product of these factors is divided by twelve to reach the monthly retirement annuity benefit.

40.    Benefits provided under Act 447 applied to all Commonwealth employees until the effective date of Act 1, which left in place the benefits for incumbent employees and retirees under Act 447 but created a new (lower) "tier" of DB Pension benefits for Commonwealth employees hired on or after Act 1's effective date.  ERS internally refers to members hired between April 1, 1990 and December 31, 1999 -- and therefore whose benefits are defined with reference to the Act 1 tier of benefits -- as "Act 1 members."

41.    Although Act 1 made significant changes to the traditional defined benefit accrual formula for Act 1 members, *i.e.* new employees hired as of April 1, 1990, the benefits earned and accrued by Act 1 members were still to be accrued as DB Pensions and provided for a defined benefit upon retirement.

42.    As noted, Act 1 implemented a reduced benefit tier for new hires, but it also increased both the employer's and employee's contributions into the pension system trust fund.  Act 1's Statement of Motives noted that although Act 447 members would also see an increase in their

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

employee contributions "from 7% to 8.275% of [their] salary" going forward, their already-accrued vested benefits would not be affected, as

> "they will keep all their rights under the Retirement Act in force, with the certainty that the System will have the necessary resources for the payment thereof.  Therefore, as of the date of the approval of this Act, the employees shall have the same benefits to which they are entitled now, upon their retirement that is, the benefits they will receive will not be affected in the least."

### *The Commonwealth's "Reform 2000"*

43.    Ten years later, the Commonwealth enacted Act 305 of 1999, known as Reform 2000, which adopted an entirely different (but still mandatory) type of pension system for employees hired on or after its effective date of January 1, 2000.  Under Reform 2000, the Commonwealth established individual employee retirement savings accounts ("System 2000 RSAs") in lieu of the DB Pensions described above.  Employees covered only by Reform 2000 are referred to as "System 2000 members" by ERS.

44.    A small number of Act 447 and Act 1 members elected to voluntarily transfer their DB Pension benefits into a System 2000 RSA under a program permitting such a voluntary transfer established by Reform 2000.  Act 305 set forth the formula for converting such members' accrued DB Pension entitlement under the DB Pension Plan into a System 2000 RSA cash balance.

45.    Act 305 provided that each and every System 2000 participant "shall always have one hundred percent (100%) vested rights" to the entire value of her RSA, which value consisted of the employee's own contributions from her wages to her RSA, plus the investment yield (subject to a minimum floor yield) on the RSA account balance for each semester of the fiscal year based on an investment alternative elected by the participant (Section 30), plus any initial RSA transfer balance as to the few employees who voluntarily transferred from the DB plan.

46.    ERS provided for three investment options in which employees could choose to invest in increments of ten percent of their total account balance: (1) fixed income (yield equal to the average monthly yield of the two-year constant maturity treasuries during each semester of the fiscal year), (2) 75% of the net yield of the investment portfolio of ERS during each semester of the fiscal

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

year (later raised to 90% by statute effective July 1, 2004), or (3) other alternatives adopted by the ERS Board.

47.    Reform 2000 provided that the "interest of any participant in the Program shall not constitute a security for the purposes of . . . the Uniform Securities Act."

48.    In other words, System 2000 established a cash balance plan funded purely by employees who directly contributed to their cash balance accounts from their wages, and who thereby had a 100% vested right in their account balance at all times.  Neither the Commonwealth nor other ERS-participating employers (e.g., municipalities) contributed to System 2000.  Rather employees' account balances were funded by their own individual contributions from earned wages.  Such accounts are employees' property.

49.    Although, for investment purposes, ERS commingled employees' accounts with all other trust funds, it employed accounting measures to maintain each employee's RSA balance, including attributing any gains earned by the employees due to the actual investment earning or minimum investment guarantee.  System 2000 further provided (Section 28) that the "right to retirement or disability annuities, death benefits, or any other benefits pursuant to the provisions of this Act, regardless of their designation, is a personal right of the recipient thereof."

50.    Pursuant to Act 296 of 2004, a retiring member could elect to receive her System 2000 benefit as a lump sum payment or have it converted to an annuity.

51.    Upon information and belief, ERS issued or made available to System 2000 participants statements indicating their individual account balances and earnings.

52.    Upon information and belief, System 2000 participants employed by the Commonwealth received on their wage statements (or paystubs) a notification of the amount of their wages contributed (mandatorily) to their RSAs.

*Act 3's Defined Contribution Hybrid Contribution Account*

53.    In 2013, the Commonwealth yet again amended the terms of its pension and retirement plans through Act 3 of 2013, the effect of which was to establish individual defined contribution accounts ("DC Plan Accounts") for all existing and future Commonwealth employees. Under Act 3, all employees hired before System 2000 who had remained in the DB Pension plans

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

authorized by Act 447 and Act 1 ceased earning additional service credits under the DB Pension plans (Section 17) and were enrolled in a going-forward basis in DC Plan Accounts similar to a System 2000 RSA. In pension parlance, this means the DB Pension plans were "frozen" as of July 1, 2013, and members of such plans were enrolled going-forward in Act 3's defined contribution system.

54. Act 3, in freezing DB Pension benefits but preserving the vested right to those pension benefits already accrued through work already performed, constituted a recognition of the inviolability of those already-accrued vested benefits. As stated in Act 3's Statement of Motives:

> [I]t must be clear that the benefits accrued by active public employees under the laws that covered them up to the effective day of this Act, shall subsist and shall be paid in accordance with the provisions of said laws. Therefore, at the time of their retirement, public employees participating in the programs established under Act No. 447 and Act No. 1 shall receive an annuity which shall combine: (i) the annuity resulting from the benefits they have accrued under the program in which they participated, as of the effective date of this Act, plus (ii) the annuity that they may acquire with what is accrued under the new defined contribution hybrid plan from the present to the time of their retirement.

Likewise, Act 3 provided that "Benefits of System Participants, under this Act, who retire on or before June 30, 2013 shall not be modified" and "[t]he right of every participant who, as of June 30, 2013 was eligible to receive a deferred pension for meeting all the requirements thereof, to receive such pension regardless of whether he/she has applied therefor, is hereby preserved."

55. Act 3 also transferred each individual System 2000 participant's RSA balance into a corresponding DC Plan Account established for that purpose, and to which the employee would make all future contributions deducted from wages. Further, it eliminated the lump sum retirement option and provided that the new DC Plan would provide only an annuity retirement option, at which point the DC Plan Account "shall cease to exist" (Section 17).

56. Under the DC Plan, each member has a "nonforfeitable" right to their contributions to the DC Plan and, with respect to System 2000 members' conversion, a "nonforfeitable" right to their RSA account balances. For all employees, Act 3 increased employees' contributions to their retirement accounts to 10% of their compensation (Section 19) while continuing to provide for no

14

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

employer contributions (with limited exceptions to this rule for certain employees participating in, and coordinating their benefits with, Social Security).

57.     Act 3's Statement of Motives declared in unambiguous terms that it "honors and validates the accrued benefits of pensioners, whose accrued benefits shall not be affected, and those of active public employees that continue contributing to the System."

58.     The central difference between a System 2000 RSA and an Act 3 DC Plan Account was that the DC Plan Account offered only one investment option.  Like System 2000, DC Plan Accounts are credited with a return on investment, but that return was to be "determined by the [ERS] Board and shall never be less than eighty percent (80%) of the System's portfolio net rate of return during each semester of each fiscal year."  ERS earned an annual rate of return, on a gross asset basis, of 8.46% in the plan year ending June 30, 2014 and 3.49% in the plan year ending June 30, 2015 (the first two years of Act 3 accruals).  Act 3 also stated that DC Plan "participants shall always have one hundred percent (100%) right over the initial balance transfer . . . and their contributions to the Hybrid Program accounts" (Section 22).

59.     Commonwealth courts have repeatedly held that benefits earned under ERS, such as under the DB Pension Plan and System 2000, constitute proprietary interests and vested contractual rights protected from impairment by the Constitution of Puerto Rico.

60.     Subsequent to Act 3, the Commonwealth passed Act 244 of 2014, which promised (Section 2) that in subsequent fiscal years, ERS would receive an Additional Uniform Contribution in the amount certified by the external actuary of the System as necessary to avoid having the projected gross assets of ERS, during any subsequent fiscal year, fall below $1 billion.

**B.      PROMESA AND THE FISCAL PLAN**

61.     On May 18, 2016, United States Representative Sean Duffy (R-WI) introduced the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA) in the United States House of Representative as H.R. 5278.  PROMESA was referred to the House Committee on Natural Resources.

62.     The Committee on Natural Resources met in open session on Tuesday, May 24, 2016 and Wednesday, May 25, 2016 to markup PROMESA.

15

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

63.    On June 29, 2016, President Obama signed PROMESA, as amended, into law as Public Law 114-187.

64.    Broadly speaking and as relevant here, PROMESA establishes an Oversight Board for Puerto Rico (Title I); sets forth a process for the Oversight Board to approve a Fiscal Plan governing the territory's future finances and budgets (Title II); provides a process for the territory to declare bankruptcy if necessary (Title III); and provides an alternative mechanism for adjusting the territory's bond debt without declaring bankruptcy (Title VI).

65.    Although it applies to all United States Territories, PROMESA was drafted with Puerto Rico and its current fiscal condition specifically in mind, as reflected by the fact that it creates an Oversight Board explicitly for Puerto Rico but for no other territory.

66.    The basic purpose of PROMESA is to provide federal territories, and especially Puerto Rico, with the tools to address a financial crisis under the supervision of an "Oversight Board" and subject to specific constraints and protections.

67.    The heart of PROMESA is the Fiscal Plan, which provides the territory with a financial roadmap, approved by the Oversight Board, to govern territory finances for at least five years.

68.    Where, as here, the territory is saddled with extreme amounts of bond debt, Title VI provides a mechanism for lawfully adjusting the terms of that debt through a process that includes mandatory participation by the holders of the bond claims.  If the Title VI process fails, Title III provides the territory with the authority to seek bankruptcy protection, but only after obtaining a Fiscal Plan and subject to the condition that any plan of reorganization that emerges from the bankruptcy case must comply with the Fiscal Plan.

69.    Critically, the Fiscal Plan, as the core governing document for a territory both in and out of bankruptcy, has a specific set of requirements and constraints including, pertinent here, the requirement that the territory's public pension systems be adequately funded.

70.    Title I of PROMESA, 48 U.S.C. § 2121 *et seq.*, establishes an Oversight Board for Puerto Rico.  The Oversight Board is defined as an entity within the territorial government, although the President of the United States appoints its seven members.  The Oversight Board is given

16

discretion to review and then approve or reject proposed Fiscal Plans offered by the Governor on behalf of the Commonwealth.  It also permits the Oversight Board to establish its own Fiscal Plan if it rejects the Governor's proposal -- even following revisions made by the Governor after consultation with the Oversight Board – if the Board determines the Governor's plan does not meet the Fiscal Plan Requirements set forth by PROMESA.  Ultimately, the Oversight Board is given the responsibility to "certify" a Fiscal Plan that is proposed by the Governor or that it has developed following rejection of the Governor's, which certification is a precondition for such a plan to go into effect.

71.     Although an Oversight Board established under Title I is given significant authority, that authority is not unrestricted, as set forth in Title II of PROMESA, entitled "RESPONSIBILITIES OF THE OVERSIGHT BOARD," at 48 U.S.C. § 2141, *et seq*.

72.     Within Title II, PROMESA Section 201(b) sets forth a number of "requirements" for any Fiscal Plan including, pertinent here, that plans "provide adequate funding for public pension systems" (the "Adequate Pension Funding Requirement").

73.     As alleged herein, all Defendants failed to adhere to this requirement in purporting to develop, review, approve and/or certify the Final Fiscal Plan.

74.     The meaning of the Adequate Pension Funding Requirement is clear on its face: earned pension benefits owed by a pension system must be adequately funded under a Fiscal Plan to a degree that is adequate to support them.  This is also apparent from PROMESA's legislative history. At the Committee on Natural Resources markup of PROMESA, Representative Fleming (R-AZ) offered Amendment Number 92, which would have amended the Adequate Pension Funding Requirement to read as follows: "provide adequate funding, or other reasonable alternatives, to satisfy contribution liabilities to public pension systems, but solely to the extent that such contributions are due under the terms of the applicable pension plan (*as may be restructured pursuant to this Act*) in the fiscal years covered by a Fiscal Plan" (emphasis added).  Representative Fleming's Amendment Number 92 was rejected by a voice vote of the Committee, leaving the Adequate Pensioning Funding Requirement in place as originally drafted.

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

75.     There are two methods by which PROMESA allows a Fiscal Plan to be certified by the Oversight Board: (1) certifying the Governor's proposed Fiscal Plan as-is, or (2) developing and certifying its own Fiscal Plan following rejection of the Governor's Fiscal Plan.

76.     More specifically, Section 201(c) of PROMESA sets forth procedures for the "Development, Review, Approval, and Certification of Fiscal Plans." First, the Governor is charged with developing a "proposed Fiscal Plan" (Section 201(c)(2)) which must be reviewed by the Oversight Board. In reviewing a proposed Fiscal Plan, the Oversight Board must review it "to determine whether it satisfies the requirements set forth in subsection (b) [of Section 201]," which includes the Adequate Pension Funding Requirement. Upon review, the Oversight Board is charged with either accepting or rejecting the Governor's proposed Fiscal Plan. Specifically, if the Oversight Board "determines in its sole discretion that the Proposed Fiscal Plan . . . satisfies such requirements, the Oversight Board shall approve the proposed Fiscal Plan," but if the Oversight Board "determines in its sole discretion that the proposed Fiscal Plan . . . does not satisfy such requirements, the Oversight Board shall provide to the Governor . . . an opportunity to correct the violation."

77.     In the event the initial Fiscal Plan proposed by the Governor is not certified under Section 201(c), Section 201(d) sets forth procedures for submission by the Governor of a "Revised Fiscal Plan." First, as set forth at Section 201(d)(1), the Governor is charged with submitting a Revised Fiscal Plan to the Oversight Board following receipt of a "notice of violation" from the Oversight Board.

78.     As set forth at Section 201(d)(2), "[i]f the Governor fails to submit to the Oversight Board a Fiscal Plan that the Oversight Board determines in its sole discretion satisfies the requirements set forth in subsection (b) [of Section 201]. . . the Oversight Board shall develop and submit to the Governor and the Legislature a Fiscal Plan that satisfies the requirements set forth in subsection (b)."

79.     Notably, while PROMESA consistently refers to the Oversight Board's decision to reject or certify the democratically-elected Governor's proposed Fiscal Plans under Sections 201(c)(3) and (d)(2) as within its "sole discretion," PROMESA does not confer similar unfettered discretion on the Oversight Board in developing and certifying its own Fiscal Plan.

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

80.    Instead, if the Oversight Board rejects a Revised Fiscal Plan, Section 201(d)(2) of PROMESA instructs that the Oversight Board "shall develop and submit to the Governor and the Legislature a Fiscal Plan that satisfies the requirements set forth in subsection (b) [of Section 201]," which includes the Adequate Pension Funding Requirement.

81.    Likewise, the mechanics of certification differ depending on whether the Oversight Board has approved and certified a Fiscal Plan proposed by the Governor—in which case Section 201(e), entitled "Approval of Fiscal Plan Developed by Governor," applies—or whether the Oversight Board has developed its own Fiscal Plan—in which case Section 201(e)(2), entitled "Deemed Approval of Fiscal Plan Developed by Oversight Board," applies.

*The Governor's Proposed and Revised Fiscal Plans*

82.    On October 14, 2016, then-Governor of Puerto Rico Alejandro García Padilla submitted to the Oversight Board the first proposed Fiscal Plan for the Commonwealth (the "García Padilla Plan").

83.    The García Padilla Plan provided adequate funding for public pension systems as required by PROMESA.  As the García Padilla Plan noted (page 8), it would "ensure the payment of an already meager average benefit that is only 53 percent of the average U.S. State."  It did not provide for any reductions to already-accrued vested retirement benefits, whether DB Pensions or DC Plan account balances, and set forth an actuarially-determined schedule for employer contributions to adequately fund the pension systems in order to provide the benefits that had been earned thereunder, as required by PROMESA.

84.    The García Padilla Plan was rejected by the Oversight Board at its meeting on November 18, 2016.  At that meeting, the Oversight Board adopted and communicated publically a set of five principles for the Fiscal Plan.

85.    Following the inauguration of Governor Rossello on January 2, 2017, the Oversight Board, on January 18, 2017, sent Governor Rossello a letter, pursuant to PROMESA Section 201(c)(3), that provided "recommendations for revisions to the applicable Fiscal Plan" and an opportunity to correct the García Padilla Plan through submission of a revised plan by February 28, 2017.  The Board's letter stated, without any careful explanation as to precisely why, that "a

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

reduction of approximately 10% in pension costs and related expenses may be necessary, for savings of $0.2 billion [per year] by fiscal year 2019."

86.     Governor Rossello submitted his first Revised Fiscal Plan – a revision of the García Padilla Plan – to the Oversight Board on February 28, 2017 (the "February 28 Plan").  The February 28 Plan proposed no funding for public pension systems *per se*, but instead provided for a "pay-as-you-go model to cover remaining defined benefit obligations" from the Commonwealth's general budget.

87.     The February 28 Plan further provided that earned accrued pension benefits would be reduced by $60 million per year beginning in 2018, for a cumulative reduction of 3% ($563 million in total by end of fiscal year 2026), by cutting 30% of all current and future retirement benefits that exceed $2000 per month.  For example, the February 28 Plan stated that a vested and accrued monthly pension benefit of $3000 would be reduced to $2700 per month by cutting 30% of the $1000 in monthly benefits earned above $2000, generating a net reduction of 10% to that hypothetical pensioner's retirement income security.

88.     On March 9, 2017, the Oversight Board, exercising "its sole discretion" to either approve or reject the Governor's Revised Fiscal Plan, sent the Governor a letter stating that the February 28 Plan did not "comply with the requirements set forth in PROMESA."  Despite noting that, in the Oversight Board's view, the February 28 Plan was "heading in the right direction" in many areas, the Board again insisted—as it had at its November 18, 2016 meeting and its January 18, 2017 letter—on a firm, round and unexplained "10% benchmark" for pension cuts.  The Oversight Board also stated that it would approve a Fiscal Plan on March 13, 2017.

89.     The Governor, in response, submitted another Revised Fiscal Plan on March 13, 2017 (the "March 13 Plan").  The March 13 Plan provides for nearly identical pension cuts to the February 28 Plan ($541M in total, but with cuts beginning as of 2020 rather than 2018), but closed revenue and cost gaps in a number of other significant areas.

90.     At this point, pursuant to PROMESA, the Oversight Board could elect one of two options under Section 201: (1) exercise "its sole discretion" and approve the democratically-elected Governor's March 13 Plan pursuant to Section 201(c)(3); or (2) "develop and submit," without the

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

benefit of such discretion, "a Fiscal Plan that satisfies the requirements set forth in subsection (b)" of Section 201 (which necessarily includes the Adequate Pension Funding Requirement applicable to all Fiscal Plans) pursuant to Section 201(d)(2).

91.    Rather than pursue either of the options legally available to it under PROMESA, the Oversight Board, at a public meeting it held later on March 13, 2017, instead steered a course that PROMESA does not authorize: the Board issued a "Fiscal Plan Certification" which purported to "approve[] and certify[y] the Governor's latest proposed fiscal plan pursuant to PROMESA § 201(e), *as modified by*" two amendments made by the Oversight Board (emphasis added).

92.    Despite lacking statutory authority to amend a Revised Fiscal Plan under Section 201, the Oversight Board purported to amend the March 13 Plan in two ways: (1) imposing a furlough program for Commonwealth employees and removal of all Commonwealth employee Christmas bonuses, and (2) requiring that the 3% pension cuts already specified in the Governor's proposed fiscal plan be "supplemented to provide for progressively reduced total pension outlays by 10% by fiscal year 2020" subject only to the constraint "that no member is pushed below the federal poverty line as a result of the reductions."

93.    Notably, the federal government does not publish a "Federal Poverty Line" and presumably the Oversight Board's statement refers to the Department of Health and Human Services' Annual Update of the HHS Poverty Guidelines, most recently published in Vol. 82, No. 19, p. 8831 of the Federal Register (January 31, 2017), which for an individual living in the contiguous United States and District of Columbia is an annual income of $12,060. A guideline is not published for Puerto Rico, and the cost of living in Puerto Rico is substantially higher than in the contiguous United States.

94.    The Oversight Board's purported "amendment" of the Governor's Fiscal Plan that it simultaneously purported to certify was contrary to PROMESA for at least two reasons. First, the Board was not authorized to make "amendments" to the Governor's March 13 Plan and then approve and certify pursuant to Section 201(e)(1). Second, it violated the Adequate Pension Funding Requirement.

21

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

*The Effect of the Final Fiscal Plan*

95.     Under PROMESA, once a Fiscal Plan is certified, the certification requires that all governmental actions going forward comply with the Fiscal Plan, setting in motion a process under which it must be implemented and adhered to by the Commonwealth government without exception.

96.     For example, Section 202 of PROMESA requires a territory's budget to comply with the Fiscal Plan, and Section 204 requires the territory's legislative acts to comply with the Fiscal Plan.

97.     A certified Fiscal Plan also establishes the basis for readjustment of Commonwealth debts in the event the territory files for bankruptcy under Title III of PROMESA, entitled "ADJUSTMENT OF DEBTS."  Title III establishes a procedure for a territory to declare bankruptcy similar to that of a municipality under Chapter 9 of the U.S. Bankruptcy Code.

98.     Prior to PROMESA, territories of the United States were not authorized to enter bankruptcy or to pass their own debt adjustment statutes.  *See Puerto Rico v. Franklin California Tax-Free Trust,* 136 S. Ct. 1938 (2016).

99.     In other words, under PROMESA, as in Chapter 9 of the Bankruptcy Code, territories can now, for the first time, seek bankruptcy protection by submitting a "Reorganization Plan" that adjusts their debts.  However, unlike under Chapter 9, under PROMESA the Reorganization Plan submitted by the territory is constrained in that it must "comply with" the certified Fiscal Plan, which in turn should be constrained by, among other requirements, the Adequate Pension Funding Requirement.

100.     Specifically, Section 302 of PROMESA provides that in order for a territory to be a debtor under Title III entitled to seek bankruptcy relief, an Oversight Board must have "issued a certification under section 206(b) of" PROMESA for the territory.  Likewise, Section 304 provides that a Title III bankruptcy case "is commenced by the filing with the district court of a petition by the Oversight Board pursuant to a determination under section 206" which, in turn, provides that before the Oversight Board can issue a restructuring certification for a territory, the territory must have "adopted a Fiscal Plan certified by the Oversight Board." In short, the Fiscal Plan determines the actions that may be taken to reorganize under the bankruptcy procedures of Title III.

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

101.    Section 301(a) makes applicable to Title III a number of sections of the U.S. Bankruptcy Code, including 11 U.S.C. § 362, which provides for an automatic stay of litigation against the debtor.

102.    Section 304(b) further provides that once the Commonwealth has filed a petition for a Title III bankruptcy, no party may, for 120 days, file an objection to the petition alleging the petition "does not meet the requirements of this title."

103.    Importantly, Section 312 provides that the filing of a plan of adjustment under Title III, through which a territory seeks to adjust its debts with the approval of the District Court, may only be filed by the Oversight Board "after the issuance of a certificate pursuant to section 104(j)", *i.e.*, following certification of a Fiscal Plan.

104.    More critical, however, is Section 104(j) itself, which provides that the Oversight Board may only certify a plan of adjustment if the plan of adjustment "is consistent with the applicable certified Fiscal Plan."

105.    Therefore, in the event the Commonwealth were to seek bankruptcy protection under Title III—an event that is imminent—the terms of the Final Fiscal Plan will establish the terms of the plan of adjustment submitted by the Commonwealth in bankruptcy; any objection that the Final Fiscal Plan violates Title III of PROMESA would not be considered for at least 120 days; and the instant Complaint would be automatically stayed.

106.    Further still, under Section 314(7) of PROMESA, a bankruptcy court is empowered to approve a territory's plan of adjustment only if it "is consistent with the applicable Fiscal Plan certified by the Oversight Board under Title II."

107.    Put simply, it is anticipated that if the Commonwealth files for bankruptcy under Title III, the 10% pension cuts provided for in the Final Fiscal Plan will be 'set in stone' with respect to any bankruptcy petition or at least that will be the position taken by the Commonwealth and those with adverse interests to Plaintiffs.

108.    However, Title VI, entitled "CREDITOR COLLECTIVE ACTION," provides a process for pre-bankruptcy renegotiation and adjustment—i.e., without filing a case under Title III— of the billions of dollars of bond claims held against the territory.

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

1

2

**C.    COMMONWEALTH DEBT, ITS TREATMENT BY THE FINAL FISCAL PLAN, AND THE IMMINENCE OF BANKRUPTCY**

3

109.    The Final Fiscal Plan did not set forth any specific cuts to debts owed to

4

Commonwealth creditors, with the sole exception of cuts to vested retirement benefits already

5

accrued for employment services already performed, such as by the Individual Plaintiffs.

6

110.    In particular, the Final Fiscal Plan explicitly states that it has "not determined . . .

7

[w]hether any particular bond or debt issuance may have been improvidently issued."

8

111.    That question—whether any particular bond or debt issuance may have been

9

improvidently issued—is currently at issue in ongoing litigation involving two groups of competing

10

bondholders, *Lex Claims LLC v. Garcia Padilla* (DPR Case No. 16-2374).  The General Obligation

11

Bondholder plaintiffs in that case allege that so-called "COFINA bonds"—which, according to the

12

March 13 Plan, total about $17B in Commonwealth debt outstanding—were unlawfully issued and

13

are *ultra vires*.  Meanwhile, the COFINA bondholders have intervened and counterclaimed that

14

billions of dollars in Puerto Rico General Obligation Bonds (GO Bonds) were unlawfully issued

15

because all such bonds issued since 2011 were in excess of Puerto Rico's constitutional debt ceiling.

16

112.    The question of the legality of Puerto Rico's outstanding bond debt has also been the

17

subject of ongoing investigation by the Commonwealth itself, through its Commission for the

18

Comprehensive Audit of the Public Credit, which was created by Law 97 of 2015 and whose

19

findings, PROMESA instructs at Section 413, remain a valid source for "review and consideration . .

20

. by Puerto Rico's government or an Oversight Board for Puerto Rico."

21

113.    According to the March 13 Plan, the Commonwealth and other entities covered by the

22

March 13 Plan had approximately $52 billion in outstanding debt (excluding pension liabilities) as of

23

February 2017.  A finding that the COFINA bonds are unlawful would render Puerto Rico solvent.

24

114.    Likewise, a finding that the GO Bonds allegedly issued in excess of the constitutional

25

debt limit were, in fact, *ultra vires,* would exceed the pension savings in either the March 13 Plan or

26

the Final Fiscal Plan to the extent such a finding were to relieve the Commonwealth of obligations

27

under those Bonds.

28

24

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

115.    In the meantime, the Commonwealth has not modified any bond claims under Title VI of PROMESA.

116.    Upon information and belief, the Commonwealth is engaging in active negotiation and mediation with bond claim holders and other creditors as to the debts allegedly owed them.

117.    The Commonwealth has not attempted to negotiate with any Plaintiff over pension cuts, either individually or through an authorized representative.

118.    The *Lex Claims* litigation, like a number of cases seeking damages from the Commonwealth for liability claims that were "or could have been commenced before the enactment of" PROMESA (unlike the instant Complaint), is stayed, pursuant to Section 405, until May 1, 2017.

119.    Under PROMESA Section 405(d), the litigation stay can only be extended beyond May 1 if Puerto Rico files for bankruptcy under Title III, which would trigger the automatic stay under the Bankruptcy Code.

120.    Upon information and belief, the Commonwealth would not be able to provide essential services without the protection of the litigation stay, and therefore the Commonwealth will be forced, and currently plans, to file for bankruptcy under Title III of PROMESA no later than May 1, 2017.

**D.    THE CASE AND CONTROVERSY**

121.    The Final Fiscal Plan proposes 10% cuts to pensions, which will result in cuts to vested benefits already-accrued through completed employment services by the Individual Plaintiffs and SPU's active and retired members.

122.    The Final Fiscal Plan's 10% cut to pensions include, at a minimum, 30% cuts to every dollar over $2000 per month received in vested, already-accrued benefits, as well as other reductions necessary to comply with the Final Fiscal Plan.

123.    The Individual Plaintiffs, as well as numerous other Commonwealth employees and retirees represented by Plaintiff SPU, receive now or will be entitled to receive a monthly retirement benefits in excess of $2000, which they earned and accrued through employment services already rendered in full to the Commonwealth.

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

124.    The Individual Plaintiffs, as well as numerous other Commonwealth employees and retirees represented by Plaintiff SPU who receive now or will be entitled to receive a monthly retirement benefit in excess of $2000, will suffer serious, irreparable harm even if their benefits are only cut at the minimum level described in the February 28 Plan.  They will undoubtedly suffer even more under the Final Fiscal Plan.

125.    The imminence of the pension cuts set forth in the February 28 Plan alone—which will be even higher under the Final Fiscal Plan—is causing present injury to the Individual Plaintiffs, as well as numerous other Commonwealth employees and retirees represented by Plaintiff SPU, by forcing them to plan their futures to account for the reduced future retirement benefits, such as by returning to work in retirement; changing medicines to lower-cost options or foregoing treatment altogether; moving to less expensive accommodations; and even moving from the Commonwealth to the Continental United States.

126.    The illegal pension cuts commanded by the Final Fiscal Plan will imminently become binding on the Commonwealth if the Final Fiscal Plan is permitted to control the Commonwealth's restructuring of its pension obligations, and the Commonwealth is preparing to file for bankruptcy in a matter of days, at which point the Commonwealth will implement the Final Fiscal Plan.

127.    Serious, irreparable injury will result, in addition to the cloud of uncertainty permeating such a bankruptcy, when, following a reorganization and lifting of the automatic stay, Plaintiffs suit proceeds and the Court determines the Fiscal Plan was unlawfully promulgated and substantively violated PROMESA such that the bankruptcy filing was unauthorized and the Court overseeing it lacked jurisdiction under PROMESA.

### FIRST CAUSE OF ACTION - ALL DEFENDANTS
### REQUEST FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
### (UNDER 28 U.S.C. §§ 2201 AND 2202, U.S. CONSTITUTION ARTICLE I, SECTION 10)

128.    Each and every allegation set forth above is incorporated herein.

129.    The Individual Plaintiffs' contractual right, and the contractual right of Plaintiff SPU's members, to already-accrued and earned retirement benefits for fully-performed past employment service is protected from impairment by the Contracts Clause, Art. I, Sec. 10 of the U.S. Constitution,

26

as is the value of their defined contribution accounts consisting of their own contributions of wages and investment income earned thereon.

130.    Defendants have substantially impaired Plaintiffs' contractual right to already-accrued retirement benefits for fully-performed past employment services, and their wages contributed and held in trust in their defined contribution accounts, as alleged above.

131.    Defendants' impairment of Plaintiffs' contractual right to already-accrued retirement benefits for fully-performed past employment services (and taking of Plaintiffs' property from their DC plan balances) was not reasonable or necessary, for at least the following reasons:

a.    The round 10% number identified for cuts to pension benefits by the Oversight Board is not based on any careful, factual or numerically-driven analysis, nor the result of balancing, but rather is an attempt to extract pension cuts as a matter of political expediency;

b.    The 10% cuts required by the Oversight Board are neither reasonable nor necessary in light of the ongoing controversy as to whether other debt figures allegedly owed by the Commonwealth were in fact improvidently issued and therefore *ultra vires*;

c.    The 10% cuts required by the Oversight Board are neither reasonable nor necessary now that the Commonwealth has access to Title VI of PROMESA as a means of adjusting bond claims, and certainly not prior to the conclusion of the Title VI process;

d.    The 10% cuts required by the Oversight Board are neither reasonable nor necessary now that the Commonwealth has access to Title III of PROMESA, which allows for the reorganization of Commonwealth debt subject to the Adequate Pension Funding Requirement;

e.    The 10% cuts required by the Oversight Board are neither reasonable nor necessary now that the Commonwealth is subject to Section 201(b)(1)(C) of PROMESA, the Adequate Pension Funding Requirement;

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

f.   The 10% cuts required by the Oversight Board are neither reasonable nor necessary because they convert the Commonwealth pension promises into a pay-as-you-go system, providing no means of ensuring that the solvency of ERS will actually be enhanced by the Final Fiscal Plan and thereby violating the Contracts Clause for the reasons set forth by the Puerto Rico Supreme Court in *Asociación AMPR v. Sist. Retiro Maestros IV*, 2014 TSPR 58 (P.R. Apr. 11, 2014); and

g.   The gulf between the García Padilla Plan, the March 13 Plan, and the Final Fiscal Plan, in addition to all the reasons outlined above, make clear that Defendants have imposed a drastic impairment when several other moderate courses were available to address Puerto Rico's financial crisis.

h.   Defendants have other less drastic and more constitutionally-sound means of addressing the Commonwealth's fiscal standing;

i.   The threatened pension cuts are not necessary to the Commonwealth's purpose, which is to improve its fiscal standing.

132.   A present case and controversy exists respecting the Plaintiffs' rights and Defendants' obligations respecting Plaintiffs' already-accrued retirement benefits for fully-performed past employment services.

133.   Such controversy arises under the United States' Constitution and PROMESA.

134.   This Court is able and authorized to resolve such controversy by declaratory action and, with respect to Plaintiffs' constitutional claims, injunctive relief.

## SECOND CAUSE OF ACTION - INDIVIDUAL DEFENDANTS
### REQUEST FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
### (UNDER 42 U.S.C. § 1983; U.S. CONSTITUTION ARTICLE I, SECTION 10)

135.   Each and every allegation set forth above is incorporated herein.

136.   The Individual Defendants, acting under color of law, have caused the substantial impairment of the Individual Plaintiffs' contractual right, and the contractual right of Plaintiffs SPU's members, to already-accrued retirement benefits for fully-performed past employment service, as well as to the value of their defined contribution accounts consisting of their own contributions of

28

wages and investment income earned thereon, in violation of the Contracts Clause, Art. I, Sec. 10 of the U.S. Constitution.

137.    But for the Individual Defendant's actions, the Individual Plaintiffs' contractual right, and the contractual right of Plaintiff SPU's members, to already-accrued retirement benefits for fully-performed past employment service, as well as to the value of their defined contribution accounts consisting of their own contributions of wages and investment income earned thereon, would not have been impaired.

138.    Plaintiffs seeks only declaratory and injunctive relief from the Individual Defendants.

### THIRD CAUSE OF ACTION - ALL DEFENDANTS

**REQUEST FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**(UNDER 28 U.S.C. §§ 2201 AND 2202, PUERTO RICO CONSTITUTION ARTICLE II, SECTION 7)**

139.    Each and every allegation set forth above is incorporated herein.

140.    The Individual Plaintiffs' contractual right, and the contractual right of Plaintiffs SPU's members, to already-accrued retirement benefits for fully-performed past employment service, as well as to the value of their DC Plan Accounts consisting of their own contributions of wages and investment income earned thereon, is protected from impairment by the Puerto Rico Contracts Clause, Art. II, Sec. 7.

141.    Defendants have substantially impaired Plaintiffs' contractual right to already-accrued retirement benefits for fully-performed past employment services, as well as to the value of their defined contribution accounts consisting of their own contributions of wages and investment income earned thereon, as alleged above.

142.    Defendants' impairment of Plaintiffs' contractual right to already-accrued retirement benefits for fully-performed past employment services, as well as to the value of their defined contribution accounts consisting of their own contributions of wages and investment income earned thereon, was not reasonable or necessary, for at least the same reasons set forth above.

143.    Defendants seek to reduce the balance of Plaintiffs' and SPU members' DC Plan Accounts, accounts which are comprised of contributions by Plaintiffs from their earned wages.

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

144.    A present case and controversy exists respecting the Plaintiffs' rights and Defendants' obligations respecting Plaintiffs' already-accrued retirement benefits for fully-performed past employment services, as well as the value of their defined contribution accounts consisting of their own contributions of wages and investment income earned thereon.

145.    Such controversy arises under the Puerto Rico Commonwealth Constitution.

146.    This Court is able and authorized to resolve such controversy by declaratory action and injunctive relief.

## FOURTH CAUSE OF ACTION - ALL DEFENDANTS
### REQUEST FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF (UNDER 28 U.S.C. §§ 2201 AND 2202, PUERTO RICO CONSTITUTION ARTICLE II, SECTION 7)

147.    Each and every allegation set forth above is incorporated herein.

148.    The Individual Plaintiffs' right, and the right of Plaintiff SPU's members, to their personal property—in the form of account balances in DC Plan Accounts and/or System 2000 RSAs, funded solely by employee contributions—is protected from deprivation without due process of law by the Puerto Rico Constitution, Art. II, Sec. 7.

149.    Defendants have deprived the Individual Plaintiffs, and members of Plaintiff SPU, of their personal property right to their account balances in DC Plan Accounts and/or System 2000 RSAs without due process of law.

150.    A present case and controversy exists respecting the Plaintiffs' property rights.

151.    Such controversy arises under the Puerto Rico Commonwealth Constitution.

152.    This Court is able and authorized to resolve such controversy by declaratory action and injunctive relief.

## FIFTH CAUSE OF ACTION - ALL DEFENDANTS
### REQUEST FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF (UNDER 28 U.S.C. §§ 2201 AND 2202, PUERTO RICO CONSTITUTION ARTICLE II, SECTION 9)

153.    Each and every allegation set forth above is incorporated herein.

154.    The Individual Plaintiffs' right, and the right of Plaintiff SPU's members, to their personal property—in the form of account balances in DC Plan Accounts and/or System 2000 RSAs,

30

funded solely by employee contributions—is protected from being taken for public use except upon payment of just compensation by the Puerto Rico Constitution, Art. II, Sec. 9.

155.    Defendants have taken the property of Individual Plaintiffs and members of Plaintiff SPU, in the form of their account balances in DC Plan Accounts and/or System 2000 RSAs, without just compensation.

156.    A present case and controversy exists respecting the Plaintiffs' property rights.

157.    Such controversy arises under the Puerto Rico Commonwealth Constitution.

158.    This Court is able and authorized to resolve such controversy by declaratory action and injunctive relief.

### SIXTH CAUSE OF ACTION - ALL DEFENDANTS
**REQUEST FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
(UNDER 28 U.S.C. §§ 2201 AND 2202, U.S. CONSTITUTION AMENDMENT V)**

159.    Each and every allegation set forth above is incorporated herein.

160.    The Due Process and Takings clauses of the Fifth Amendment of the U.S. Constitution provide: "No person shall be… deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

161.    The Individual Plaintiffs' right, and the right of Plaintiff SPU's members, to their personal property—in the form of account balances in DC Plan Accounts and/or System 2000 RSAs, funded solely by employee contributions—is protected from being deprived without due process of law or taken for public use without just compensation by the United States Constitution, Amendment V.

162.    Defendants have taken the property of Individual Plaintiffs and members of Plaintiff SPU, in the form of their account balances in DC Plan Accounts and/or System 2000 RSAs, without due process of law or just compensation.

163.    A present case and controversy exists respecting the Plaintiffs' property rights.

164.    Such controversy arises under the United States Constitution.

165.    This Court is able and authorized to resolve such controversy by declaratory action and injunctive relief.

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

**SEVENTH CAUSE OF ACTION - INDIVIDUAL DEFENDANTS**
**REQUEST FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**(UNDER 42 U.S.C. § 1983; U.S. CONSTITUTION AMENDMENT V)**

166.    Each and every allegation set forth above is incorporated herein.

167.    The Individual Defendants, acting under color of law, have caused the deprivation without due process and taking without just compensation of the Individual Plaintiffs' right, and the right of Plaintiff SPU's members, to their personal property—in the form of account balances in DC Plan Accounts and/or System 2000 RSAs, funded solely by employee contributions—in violation of Amendment V of the U.S. Constitution.

168.    But for the Individual Defendant's actions, the Individual Plaintiffs' property right, and the property right of Plaintiff SPU's members, to 100% of the account balances in their DC Plan Accounts and/or System 2000 RSA, would not have been deprived without due process or taken without just compensation.

169.    Plaintiffs seeks only declaratory and injunctive relief from the Individual Defendants, namely, the confirmation and preservation of current DC Plan Account (and RSA balances therein).

**EIGHTH CAUSE OF ACTION – ALL DEFENDANTS**
**REQUEST FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**(UNDER 28 U.S.C. §§ 2201 AND 2202, 48 U.S.C. § 201(B)(1)(C))**

170.    Each and every allegation set forth above is incorporated herein.

171.    PROMESA Section 201(b)(1)(C) requires that any Fiscal Plan for the Commonwealth "provide adequate funding for public pension systems."

172.    The Final Fiscal Plan does not provide adequate funding for public pension systems and therefore violates the requirements for a Fiscal Plan under PROMESA Section 201(b).

173.    Because the Final Fiscal Plan was not proposed by the democratically-elected Governor of Puerto Rico and then approved by the Oversight Board under PROMESA Section 201(c)(3), the Oversight Board did not exercise "sole discretion" in purportedly approving the Final Fiscal Plan as amended, and its purported approval of the Final Fiscal Plan is therefore not entitled to any deference on the question of whether the Final Fiscal Plan satisfies the requirements of PROMESA Section 201(b).

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

174.    Knowing that the Final Fiscal Plan violates PROMESA Section 201(b)(1)(C)—which itself constitutes reiteration and confirmation that Plaintiffs' vested rights to retirement benefits accrued through already-performed past employment services, owed under the United States and Puerto Rico Constitutions, shall be preserved in full by PROMESA—Defendants nevertheless purported to develop, approve, and certify the Final Fiscal Plan in an effort to deprive Plaintiffs of their rights through an eventual bankruptcy case filed under Title III of PROMESA.

175.    A present case and controversy exists respecting the Plaintiffs' rights not to be subjected to a Final Fiscal Plan that unlawfully fails to provide adequate funding for the public pension systems of which the Individual Plaintiffs, and members of Plaintiff SPU, are members, and Defendants' obligation to comply with PROMESA.

176.    Such controversy arises under United States Law.

177.    Plaintiffs' rights are imminently threatened with irreparable harm by Defendant Oversight Board's plans to file a bankruptcy case under Title III of PROMESA before May 1, under which the Final Fiscal Plan must be followed.

178.    This Court is able and authorized to resolve such controversy by declaratory action and injunctive relief.

### NINTH CAUSE OF ACTION - INDIVIDUAL DEFENDANTS
**REQUEST FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**(42 U.S.C. § 1983; 48 U.S.C. § 201(B)(1)(C))**

179.    Each and every allegation set forth above is incorporated herein.

180.    The Individual Defendants, acting under color of law, have caused the violation of Plaintiffs' rights under PROMESA Section 201(b)(1)(C) not to be subject to a Fiscal Plan that unlawfully fails to adequately fund public pension systems of which the Individual Plaintiffs, and members of Plaintiff SPU, are participants.

181.    But for the Individual Defendants' actions, Plaintiffs' rights under PROMESA Section 201(b)(1)(C) would not have been violated.

182.    Plaintiffs seek only declaratory and injunctive relief from the Individual Defendants.

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

**TENTH CAUSE OF ACTION – DEFENDANT OVERSIGHT BOARD**
**REQUEST FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**(UNDER 28 U.S.C. §§ 2201 AND 2202, 48 U.S.C. § 201(B)(1)(C))**

183.    Each and every allegation set forth above is incorporated herein.

184.    PROMESA Section 201(d) requires that the Oversight Board either approve, at its sole discretion, a Fiscal Plan developed by the democratically-elected Governor, or else "develop and submit to the Governor and the Legislature a Fiscal Plan that satisfies the requirements set forth in subsection (b)" of Section 201.

185.    The Oversight Board has not approved a Fiscal Plan developed by the democratically-elected Governor.

186.    The Oversight Board has not developed and approved its own Fiscal Plan for the Commonwealth.

187.    Instead, the Oversight Board's so-called "Fiscal Plan Certification" purported to "approve and certify the Governor's latest proposed Fiscal Plan, as modified by [two] amendments."

188.    PROMESA does not contemplate or allow the Oversight Board to approve and certify a Fiscal Plan proposed by the democratically-elected Governor subject to certain amendments; instead, the Oversight Board must either approve and certify the Governor's Fiscal Plan as proposed by the Governor, or else the Oversight Board must develop its own Fiscal Plan.

189.    Therefore, the Final Fiscal Plan has not been developed, approved, or certified under PROMESA as a matter of law.

190.    Aware that the Final Fiscal Plan and the "Fiscal Plan Certification" violated the procedures for the development, approval, and certification of a Fiscal Plan required by PROMESA, as well as PROMESA's confirmation that Plaintiffs' rights to their accrued, vested retirement benefits for already-performed employment services should be maintained and protected in full through adequate funding, Defendant Oversight Board nevertheless purported to develop, approve, and/or certify the Final Fiscal Plan in an effort to impair Plaintiffs' rights through an eventual bankruptcy case filed under Title III of PROMESA.

191.    A present case and controversy exists respecting the Individual Plaintiffs' and SPU's members' rights not to be subjected to a Final Fiscal Plan that unlawfully fails to provide adequate

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

funding for the public pension systems of which the Individual Plaintiffs, and members of Plaintiff SPU, are participants, and Defendants' obligations to comply with the development, approval, and certification procedures set forth by PROMESA with respect to a Fiscal Plan.

192.    Such controversy arises under United States Law.

193.    Plaintiffs' rights are imminently threatened with irreparable harm by Defendants' plans to file a bankruptcy case under Title III of PROMESA, under which the Final Fiscal Plan must be followed.

194.    This Court is able and authorized to resolve such controversy by declaratory action and injunctive relief.

## ELEVENTH CAUSE OF ACTION - INDIVIDUAL DEFENDANTS
### REQUEST FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF
**(43 U.S.C. § 1983; 48 U.S.C. § 201(B)(1)(C))**

195.    Each and every allegation set forth above is incorporated herein.

196.    The Individual Defendants, acting under color of law, have caused the violation of Plaintiffs' rights under PROMESA Section 201(d) not to be subject to a Fiscal Plan that unlawfully purports to have been developed by the Governor and approved by the Oversight Board when it was not.

197.    But for the Individual Defendant's actions, Plaintiffs' rights under PROMESA Section 201(d) would not have been violated.

198.    Plaintiffs seeks only declaratory and injunctive relief from the Individual Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.    A Declaratory Judgment that the Final Fiscal Plan unconstitutionally impaired Plaintiffs' accrued, vested contractual right to retirement benefits based on already-performed employment services, as well as to the value of their defined contribution accounts consisting of their own contributions of wages and investment income earned thereon;

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

2.      A Declaratory Judgment that the Final Fiscal Plan unconstitutionally deprived without due process and took without just compensation Plaintiffs' property rights to 100% of individual DC Plan Account and System 2000 RSA balances, including all interest earned thereon;

3.      A Declaratory Judgment that the Final Fiscal Plan violates the requirement set forth at 48 U.S.C. § 2141(b)(1)(C) that any Fiscal Plan adequately fund public pensions systems.

4.      A Declaratory Judgment that the Final Fiscal Plan was not lawfully developed, approved, and certified under 48 U.S.C. §§ 2141(c) or 2141(d).

5.      A Permanent Injunction prohibiting Defendants and their affiliates, agents, employees, and attorneys, and any and all other persons in active concert or participation with them, from implementing the Final Fiscal Plan, including but not limited to enjoining any and all Defendants from filing a petition for relief under Title III of PROMESA until such time as the violations in the Final Fiscal Plan are cured as determined by this Court;

6.      A Permanent Injunction prohibiting Defendants and their affiliates, agents, employees, and attorneys, and any and all other persons in active concert or participation with them, from applying the Final Fiscal Plan in a manner that deprives or takes without just compensation Plaintiffs' property rights to 100% of individual DC Plan Account and System 2000 RSA balances, including interest earned thereon, including but not limited to enjoining any and all Defendants from filing a petition for relief under Title III of PROMESA until such time as the violations in the Final Fiscal Plan are cured as determined by this Court;

7.      A Permanent Injunction prohibiting Defendants and their affiliates, agents, employees, and attorneys, and any and all other persons in active concert or participation with them, from applying the Final Fiscal Plan in any manner, unless and until it is altered to provide adequate funding for public pension systems as determined by this Court, including but not limited to enjoining any and all Defendants from filing a petition for relief under Title III of PROMESA;

8.      A Permanent Injunction prohibiting Defendants and their affiliates, agents, employees, and attorneys, and any and all other persons in active concert or participation with them, from applying the Final Fiscal Plan in any manner whatsoever, including but not limited to enjoining any

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**

and all Defendants from filing a petition for relief under Title III of PROMESA in violation of Plaintiffs' constitutional rights;

9.      A Temporary Restraining Order and Preliminary Injunction that maintains the *status quo* and enjoins implementing the Final Fiscal Plan, enacting budgets that provide for reduced pension benefits pursuant to the Final Fiscal Plan, and enjoins Defendants from filing a Plan of Reorganization or otherwise invoking Title III of PROMESA based on the Final Fiscal Plan;

10.     For an award of fees and costs expended in this suit, including costs awardable pursuant to 42 U.S.C. § 1988(b); and

11.     Such other relief as the Court deems just and proper.

Respectfully submitted, in San Juan, Puerto Rico, this 12th day of April 2017.

/s/Manuel A. Rodríguez Banchs
MANUEL A. RODRIGUEZ BANCHS
RODRIGUEZ BANCHS, CSP
P.O. Box 368006
San Juan, Puerto Rico 00936-8006
Telephone:     (787) 764-8896
Facsimile: (787) 721-0975
Email: manuel@rodriguezbanchs.com

TEAGUE P. PATERSON*
MATTHEW S. BLUMIN*
AMERICAN FEDERATION OF STATE,
COUNTY & MUNICIPAL EMPLOYEES
1101 17th Street NW, Suite 900
Washington, DC 20011
Telephone:     (202) 775-5900
Facsimile:     (202) 452-0556
Email:         tpaterson@afscme.org,
               mblumin@afscme.org

Attorneys for Plaintiffs

*Applications for Admission *Pro hac vice* has been filed today under a separate cover.

37

**COMPLAINT FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF**